FILED 09 MAR '18 15:22 USDC-ORE

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
OREGON EUGENE DIVISION

Kelly A. Barnett,

      Plaintiff,

-against-

Ubimodo Inc; Ubimodo Insurance LLC; its
Advisory Board/Board of Directors; The
Soteria Institute; its Advisory Board/Board of
Directors; Scott Warner; Starr Companies;
Armour Risk Management aka Trebuchet
Holdings LLC aka Bevidere; jointly and
severable.

**Complaint for a Civil Case**

Case No. 6:18-cv-00418-MC
*(to be filled in by the Clerk's Office)*

    COMPLAINT FOR COPYRIGHT
INFRINGEMENT; EEA; FRAUD;
NATIONAL STOLEN PROPERTY
ACT; DEFENSE OF TRADE
SECRETS ACT

    DEMAND FOR JURY TRIAL

I.    **The Parties to This Complaint**

    A.    **The Plaintiff(s)**

        Provide the information below for each plaintiff named in the complaint. Attach
additional pages if needed.

| | |
|---|---|
| Name | Barnett, Kelly A |
| Street Address | PO Box 5362 |
| City and County | Bend. Deschutes |
| State and Zip Code | Oregon 97708 |
| Telephone Number | 541-501-2002 |
| E-mail Address | info@idealequinegear.com |

**B.      The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Scott Warner |
| Job or Title (if known) | CEO, Chairman of the Board Ubimodo Bookkeeper, The Soteria Institute |
| Street Address | 1001 SW Emkay BLVD, STE 100-F |
| City and County | Bend, Deschutes |
| State and Zip Code | Oregon 97702 |
| Telephone Number | 541-410-4166 |
| E-mail Address (if known) | Scott@ubimodo.com |

Defendant No. 2

| | |
|---|---|
| Name | Michael Corning |
| Job or Title (if known) | Data Scientist, Ubimodo Inc, and The Soteria Institute |
| Street Address | 160 S. Oak Street, Suite 151 |
| City and County | Sisters, Deschutes |
| State and Zip Code | Oregon, 97759 |
| Telephone Number | |
| E-mail Address (if known) | michael@soteriaInstitute.org |

Defendant No. 3

| | |
|---|---|
| Name | (Starr Companies) CV Starr & Co. |
| Job or Title (if known) | Colleen Ganon, Director of Operations |
| Street Address | 289 S. Culver Street |
| City and County | Lawrenceville, Gwinnett |
| State and Zip Code | GA, 0046-4805 |
| Telephone Number | 678-938-8530 |
| E-mail Address (if known) | Colleen.gannon@starrcompanies.com |

Defendant No. 4

| | |
|---|---|
| Name | Amour Risk Management Inc (Recently renamed Trebuchet Holdings LLC, owner of Bevidere)<br><br>A foreign entity operation on USA soil, owned by Armour Group LTD of Bermuda. |
| Job or Title (if known) | Chief Operating Officer, Marcus Dorian |
| Street Address | 1880 JFK Boulevard, Suite 801 |
| City and County | Philadelphia, Philadelphia County |
| State and Zip Code | Pennsylvania, 19103 |
| Telephone Number | 215-665-5000 |
| E-mail Address (if known) | mdorian@armourrisk.com |

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

    **x**  Federal question

Fill out the paragraphs in this section that apply to this case.

## A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

18 USC § 1831, 1832      18 USC §1312      18 USC § 514

17 CFR § 240. 12b-20, 10b-5      18 USC §1030      18 USC §1343

Federal Copyright Act      US Const. Am. 1

ORS 165.543   ORS 59.135   ORS 646.461  OR Cont. Article 1 Section 8

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

### FIRST CLAIM FOR RELIEF

[Misappropriation of Trade Secrets, Failure to Defend Trade Secrets, National Stolen Property Act, Economic Espionage Act, Conspiracy, Copyright]

1. The Plaintiff, Kelly A Vanscoy Barnett is the rightful owner of a United States Patent Serial No. US 9,398,880 B2 issued on July 26, 2016. Originally published on September 25, 2014 with a March 20, 2013 priority date. There is one child application pending. Through the Patent Cooperation Treaty,

applications were filed in the European Union, Canada and Australia. The
Plaintiff's applications in Canada and Australia are pending. Patent Figure 9c
was submitted to the United States Copyright Office on 5-17-2016 with an open
case number of 1-3432516671 by Willamette Valley Intellectual Property Law.

2. The Defendant Ubimodo is the proximate cause of loss of the Plaintiff's
   European Union application due to intentionally creating financial hardship.

3. The Defendant Ubimodo used elicitation techniques to discover the Plaintiff's
   inventive capabilities and her use of agricultural livestock as pre-human models
   for biometric monitoring, tracking, protective wear and other uses not disclosed in
   the patent applications.

4. The Defendants devised a scheme, produced artifice such as a mock website,
   "risk-free" private offerings, high-pressure tactics and rewards, and false
   financials as reward incentives to exert influence over the Plaintiff when she was
   emotionally and financially vulnerable.

5. The Defendants knew or were responsible for knowing that the Plaintiff's
   intellectual property rights were or are being violated.

6. At all times material herein, Defendant Ubimodo, Inc was and is an Oregon
   business with a principal place of business located at 1001 SW Emkay BLVD,
   Suite 100-F Bend OR 97702.

7. Defendant Ubimodo Inc, has a wholly-owned subsidiary in Toronto Canada,
   registered in August 2017, ran by President Jamie Sterling, a Canadian
   Resident.

8. At all times material herein, Defendant The Soteria Institute, Inc was and is an Oregon business with a principal place of business known to be operating through Ubimodo, Inc with a registered location at 161 Oak Street, Suite 151, Sisters Oregon 97759.

9. Ubimodo Inc and The Soteria Institute was knowledgeable that the Plaintiff was taking every possible measure to ensure that her intellectual property was patented, copyrighted or otherwise held within every reasonable effort to maintain its secrecy, including the use of passwords, and secured remote research locations. Plaintiff relied upon both entities to ensure the safety and security of her work and trade secrets.

10. At all times material herein and on information and belief, each Defendant is an agent, servant, employee, or employer of the other, and at all times relevant herein Defendants were acting within the scope and course of their role as agent, servant, employee, or employer of the other.

11. Ubimodo Inc, Ubimodo Insurance and Ubimodo LTD of Canada and The Soteria Institute failed to act within its powers in good faith, in accordance with reasonable business practices.

12. In August 2015 when the Defendant learned the Plaintiff had received a loan with follow-on capital expected, Scott Warner emailed asking if the she would consider adding Ubimodo's technology platform to her devices. After discussion, the Defendant was told his services were not needed.

13. In or about September 2015, the Defendant Scott Warner made contact with the Plaintiff via email to inquire if she would consider being a guest speaker for a

roundtable discussion for wearable technology for a conference he was planning
to hold. He invited the Plaintiff to an interview and used elicitation techniques to
ascertain her ability to convert her intellectual property to different market spaces
by asking the Plaintiff to answer "practice questions".

14. On October 9, 2015 the Defendant requested a biography and image to be
placed on his International Find Conference webpage (defunct a few months
later). Throughout October 2015, the Defendant Scott Warner continued to make
contact with the Plaintiff seeking discussions while she was in the United
Kingdom for a clinical trial.

15. Upon return to the United States, the Plaintiff and Defendant Scott Warner met in
Bend, Oregon. The Plaintiff reiterated she was not interested in working with
Ubimodo Inc for product development as she had clinical trials to compile and
would be grant writing for future work with the Central Oregon Research
Coalition, Oregon Health and Science University.

16. It was discovered in November 2017, that the Biostatistician Gary Liberson, that
made contact in the fall of 2015 with the Plaintiff, was actually sent by Ubimodo
Inc to ascertain the level of human product translation. Additionally, he inquired
of her Nursing background and fields of expertise. Which included Geriatric
Care, Surgery, and Communicable Disease and Bioterrorism Preparedness and
Response.

17. On or about December 2015, Scott Warner offered to arrange an introduction to
The Soteria Institute to consider being a fiscal sponsor for the research project

that was being collaborated between the Plaintiff and the Central Oregon
Research Coalition (Part of Oregon Health and Science University).

18. Scott Warner, his actors, agents, and realtors were given knowledge and notice
of a heightened duty of care regarding the Plaintiff's intellectual property and
trade secrets.

19. Scott Warner interviewed the Plaintiff on behalf of The Soteria Institute regarding
her research and development needs for human product translation and case-
use scenarios "to ensure that the data science and project was a match."

20. Scott Warner met with the Plaintiff and E::Space Labs LLC, all from Bend,
Oregon on or about January 7, 2016 to discuss grant needs and product
development capabilities.

21. Throughout the month of January 2016, Scott Warner on behalf of the Soteria
Institute began in depth questioning the Plaintiff about human translation work.
The parties were given knowledge and notice of how the underlying technology
could be used for medical, police and military usage with integration of wireless
communication protocols, including Unmanned Ariel Vehicle (UAV) usage.

22. Scott Warner then elicited the Plaintiff and her sister to update The Soteria
Institutes website language. As well as to customize a pre-approved grant
program documents for The Soteria Institute as a partial fee waiver for the grant
application and research oversight.

23. On January 27, 2016 Scott Warner was given notice to keep the Plaintiff's
technology out of his financing discussion with Intel Capital. The Plaintiff notified

her attorney of concerns with Ubimodo and requested an engagement letter, at
Ubimodo cost.

24. On February 25, 2016 E::Space Labs LLC hosted Jose Mata of Mata Intellectual
Property Law to discuss how to protect inventions and trade secrets. Scott
Warner toured the facility and attended part of the meeting.

25. On or about February 29, 2016 Scott Warner invited the Plaintiff to a meeting
with the Soteria Institute at Ubimodo Inc. The Plaintiff arrived to discover that
The Soteria Institute and Ubimodo Inc was comprised of the same individuals.
She also arrived to find the parties picking through her patent on a projection
screen. It became apparent that Dr. Alain Anyouzoa and others were attempting
to invent around her Patent Figure 9 (also copyrighted) for software code,
databases and Application Programming Interface (API). Dr. Anyouzoa
commented that the Plaintiff "did a good job" because they could not one-off her
figures "without owing her money." Scott Warner CEO/Chairman of the Board of
Ubimodo Inc displayed the Plaintiff's intellectual property with the clear
expression to foster infringement and promote infringe to copyright and to make
derivative works of the Plaintiffs patent applications. To avoid a legal battle, the
Plaintiff consented to consider a license negotiation.

26. February 29, 2016 Ubimodo Inc offered an Ubimodo LLC Advisory Agreement to
the Plaintiff for a "realty company." Adding confusion as to what business
Ubimodo was actually conducting.

27. March 1, 2016 Scott Warner CEO/Chairman of the Board of Ubimodo Inc
introduced the Plaintiff to Dean Carberry of Atlantic Security Limited of Bermuda.

Which the Plaintiff believed was part of the pre-approved research grant
discussions.

28. March 3, 2016 Scott Warner CEO/Chairman of the Board of Ubimodo Inc
attempted to redirect the Plaintiff's research from medical wearable garments to
sporting goods to avoid the Food and Drug Administration's requirements for
medical device development in research. Further, The Soteria wanted the
Plaintiff to change her research to a derivative product for the sole benefit of
Ubimodo.

29. March 4, 2016 Scott Warner CEO/Chairman of the Board of Ubimodo Inc
emailed the Plaintiff asking about partnering with Technion University in Israel for
research and development of smart tech garments.

   a. The Plaintiff would later learn from Scott Warner CEO/Chairman of the
      Board of Ubimodo Inc the had already shared her intellectual property with
      Dr. Anna Becker. Further, he was attempting to raise 1 Million Dollars
      through her in Israel to develop smart garments with Technion University
      based on the Plaintiff's intellectual property.

30. The Plaintiff notified Ubimodo, Inc on March 9, 2016 that her patent was being
nominated for the National Medal of Technology and Innovation by Claudia Starr
to the United States Department of Commerce dba United States Patent and
Trademark Office. The Nation's highest honor for technological achievement
awarded by the POTUS.

31. Ubimodo, Inc was knowledgeable that the Plaintiff was taking every possible
measure to ensure that her intellectual property was patented, copyrighted or

otherwise held within every reasonable effort for protection or maintain its secrecy of trade secrets.

32. At approximately 0730 on March 11, 2016 the Plaintiff discovered her personal property, including decades of research had been taken from 48 Bridgeford BLVD with no signs of forced entry. She discovered a physical loss of her computers, back-up drives, written patent drafts and handwritten continuation patent claim set. Further, all the data obtained from clinical trials, survivability case studies and animal care and use records along with personal data and personal records.

33. Scott Warner CEO/Chairman of the Board of Ubimodo, learned of the Plaintiff's theft from 48 Bridgeford BLVD on Saturday March 11 and reiterated his previous offer to have her work at a desk in his office at 1001 SW Emkay BLVD. In light of the theft, Scott Warner CEO/Chairman of the Board of Ubimodo Inc was given knowledge and notice that a heightened duty of care was required to protect trade secrets and the work to redress losses.

34. Scott Warner CEO/Chairman of the Board of Ubimodo was given knowledge and notice that in light of the theft, the Plaintiff would take extensive measures to protect her trade secrets and would take defensive measures for stolen work.

35. In March 2016 Scott Warner CEO/Chairman of the Board of Ubimodo Inc on behalf of The Soteria Institute for the benefit of Ubimodo Inc, attempted to exert influence to change the clinical research direction between the Plaintiff and the Central Oregon Research Coalition. This included meeting with the Plaintiff's

Institutional Animal Care and Use Committee Members to justify the request to
change the research direction.

36. Due to confusion created by Scott Warner CEO/Chairman of the Board of
Ubimodo Inc, the Plaintiff emailed him an example of how fiscal sponsorship
programs were run by other non-profit groups on March 13, 2016.

   a. In August 2015, Ubimodo Inc was introduced as a data science company
   whose platform could offer database services for the Plaintiff's medical
   wearable devices for data storage.

   b. On February 29, 2016 the Plaintiff was given an Advisory Board Member
   contract for a "Real Estate Industry Advisory Board" which had an
   intellectual property clause in it. The Plaintiff crossed this out and the
   change was initialed by Scott Warner CEO/Chairman of the Board of
   Ubimodo Inc and the Plaintiff. In January 2018, Ubimodo counsel Jason
   Conger provided a fraudulent version of this document to the Oregon
   State Bar (in response to an ethics complaint) by adding the Plaintiff's
   Copyright (Patent Figure 9) to the back of the Advisory Board agreement.
   With a handwritten note in the Plaintiff's handwriting that said "edit flow
   chart". The Plaintiff alleges this page was taken from her personal effects.
   This is evidenced by all modifications to the original advisory agreement
   was initialed by all parties. Further, the addition of the document is in
   violation of Amendment 10 of the contract itself for identifying and
   authorizing an amendment. Above and beyond that, the submitted

document does not match the one provided by the Defendant Scott

Warner to the Plaintiff's and her counsel during negotiations.

37. On March 14, 2016 the Plaintiff emailed her formal requests for letters of support
for her nomination to the National Medal of Technology and Innovation to
E::Space Labs LLC and Ubimodo Inc.

38. In late March, due to facts and circumstances, the Plaintiff made the decision to
leave the area and not pursue the change in direction demanded by Ubimodo
and The Soteria Institute. The Defendant Scott Warner CEO/Chairman of the
Board of Ubimodo Inc offered to cover "MI & E, Travel per Federal GSA" to keep
the Plaintiff in the area and using his office desk space. Scott Warner
CEO/Chairman of the Board of Ubimodo Inc offered "points" and shares for the
use of the Plaintiff's goodwill and retention to the area for his benefit.

39. In or around the beginning of April, Scott Warner CEO/Chairman of the Board of
Ubimodo Inc began demanding extensive work/services that the Plaintiff was
unable to provide due to disability. Nor was she willing to provide extensive labor
with no pay. She referred Scott Warner CEO/Chairman of the Board of Ubimodo
Inc to Cynthia and John McDaniels of Elderwise with an introductory meeting
held on April 6, 2016.

40. April 14, 2016 counsel Andrea Sellers at Stinson Leonard and Street was given
terms discussed by the Plaintiff and Defendant Scott Warner, along with the
bonus offerings Scott Warner CEO/Chairman of the Board of Ubimodo Inc
offered to the Plaintiff for parity requirements with the Plaintiff's existing licensee.
Scott Warner CEO/Chairman of the Board of Ubimodo Inc was advised by the

Plaintiff and by counsel that his bonus offerings presented a conflict of interest. The Defendant Scott Warner CEO/Chairman of the Board of Ubimodo Inc stated it was "to keep control of the Board, just promise you won't vote against me."

41. April 16, 2016 the Plaintiff looped Mark Davis from Code Chops of Eugene, Oregon into the discussion with The Soteria Institute and with CEO/Chairman of the Board of Ubimodo Inc Scott Warner, as Software as a Service, API, Databases and the like were already developed by the Plaintiff. She and her team had won a competition in 2013 demonstrating proof of concept for all items Ubimodo proposed. Scott Warner was in attendance to that event and served as a coach/mentor to contestants.

42. On or about April 24, 2016 the Plaintiff was driving down the road with Joshua Buzzell when her vehicle disassembled while driving. After parts testing, Liberty Mutual paid for repairs as the accident was caused by an act of Vandalism.

43. On April 27, 2016 Ubimodo and The Soteria Institute emailed the Plaintiff the fiscal sponsorship forms to execute. The Plaintiff completed and hand carried the documents to Scott Warner CEO/Chairman of the Board of Ubimodo Inc . He held the issuance of the documents to use as leverage against the Plaintiff to provide him more proprietary information with demands for labor and services the Plaintiff did not want to provide.

44. The Defendant, in response suspicion of improper use of the Plaintiff's intellectual property by Ubimodo and The Soteria Institute. Defensively, the Plaintiff registered her copyright at the US Copyright Office on 5-17-2016.

45. 5-25-2016 The Plaintiff discussed with her legal counsel the Defendant Scott Warner's demands for grant of right for military and police use of the Plaintiff's technology. An area of product development that the Plaintiff had disclosed was a field of translation.

46. 5-25-2016 The Plaintiff was given knowledge and notice by Scott Warner CEO/Chairman of the Board of Ubimodo Inc that Colleen Gannon of Starr Companies and Ubimodo Inc was formally moving into the implementation phase for API with CV Starr Information Technology company Solartis for API. Scott Warner CEO/Chairman of the Board of Ubimodo Inc ordered Norman Furlong to work with Solartis to process the transaction. Based on Facts and Circumstances, the Plaintiff believes Starr Companies had knowledge and notice of her intellectual property. Further, that Patent Figure 9 that was copyright filed enabled Ubimodo to further this agreement and ultimately allow a more rapid go to market for Ubimodo. Both entities had knowledge and notice of the Plaintiff's intellectual property.

    a. Starr Companies at Peachtree Road (the address and business used on emails, dissolved in 2015 per Georgia State Records.) CV Starr and Co is registered as a Foreign Business with an active registration.

47. The Plaintiff and Defendant entered into a Memorandum of Understanding on 5-26-2016 to engage into a license negotiation.

48. There was a teleconference on 5-31-2017 between Solartis and Norman Furlong.

49. The Defendant Ubimodo Inc added even more confusion to the relationship by changing the nature of their business to wearable devices and trying to pair the

wearable devices with an accidental death and dismemberment policy and a
search and rescue drone policy.

50. June 7, 2016, a second law firm was engaged to take over the license
negotiations as Scott Warner CEO/Chairman of the Board of Ubimodo Inc
continued to demand non-parity with the Plaintiff's original licensee. He also
agreed to cover all of the costs of new counsel at Husch Blackwell as he created
a conflict with counsel at Stinson Leonard and Street.

51. On or about June 14, 2016 the Plaintiff began to suspect unlawful use of Third-
Party content. Scott Warner made statements that Dr. Anyouzoa was bringing
"fixes" for Xerox Corporations artificial intelligence algorithms to Ubimodo,
instead of to his employer. He further stated his team as ex and current
Microsoft employees were making alterations to code of the Microsoft Azure
platform and "fixing problems that Microsoft didn't even know they had."

52. June 15, 2016 Ubimodo Inc responded in writing that Dr. Alain Anyouzoa stated
he was not in conflict with his employer (Xerox Health Care Analytics) and his
work with Ubimodo Inc. The Plaintiff requested an affidavit in writing multiple
times to clear Third-Party Content from Microsoft Corporation, Xerox Health Care
Analytics, dbS Productions LLC and other companies whose trademark/logos
appeared on his presentation slides or documents. As well as she requested
proof that the Department of Homeland Security relinquished march-in rights (a
condition of all federal research funding) to Dbs Productions to allow Bob Koester
to provide him exclusive use of a Department of Homeland Security funded
database as claimed.

53. In an email exchange on 6-25-2016, Scott Warner CEO/Chairman of the Board of Ubimodo Inc acknowledged his debts and need to make payment. He verbally requested the bulk of the Plaintiff's expense reimbursement be held pending additional investment draw down. The Plaintiff questioned Scott Warner as to where the funding she witnessed him to capture from unsophisticated investors to furtherance the negotiations with the Plaintiff had gone.

54. June 25, 2016 the Plaintiff and Defendant Scott Warner CEO/Chairman of the Board of Ubimodo Inc had a written exchange and a verbal exchange about unreasonable demands for the Plaintiff to work for Ubimodo. The Plaintiff stated she was not an employee nor a consultant for Ubimodo. She reiterated the agreement for "MI & E, Travel per Federal GSA" rate.

55. June 2016 and July 2016 the Plaintiff made multiple inquiries regarding the usage of captured investment funds obtained with her assistance based on lack of paying bills and obligations for which the funds were raised. The Plaintiff was concerned for inappropriate personal use when Scott Warner CEO/Chairman of the Board of Ubimodo Inc stated he had "had enough of this not getting paid stuff" and stated that he "was owed for all his hard work."

56. 6-28-2016 the Plaintiff requested clarification as to why Ubimodo Inc needed the ability to sublicense her Intellectual property to Garmin, Microsoft or others. (Sub-licensing was never agreed upon.) Scott Warner was instructed to desist in attempting to broker her intellectual property with cold calls or investment offerings as he was not a broker and had no rights granted. Nor would the right to sublicense be authorized in a license agreement.

57. The Defendant was argumentative with the Plaintiff that he could sub-license her
intellectual property to Strava, Map My Ride and a number of other companies
who had lost their own intellectual property rights in infringement litigation. Scott
Warner CEO/Chairman of the Board of Ubimodo Inc was given knowledge and
notice to defend the Plaintiff's intellectual property. He had no rights to make
offers and risked her intellectual property by making offers in highly litigious
areas that were outside of the scope of the issuing patent (that issued in July
2016). He was again given knowledge and notice to maintain the secrecy of
products still in research and development or awaiting clinic trial funding by the
Plaintiff. He was further instructed not share her public intellectual property with
parties known to have been in IP Litigation and make false claims of having
patent protection via the Plaintiff's issuing patent.

58. In 2016, a "Delegation" from Cameroon- where Scott Warner CEO/Chairman of
the Board of Ubimodo Inc claimed Dr. Anyouzoa is a Prince - traveled to the
United States to meet with Ubimodo Inc and the Soteria Institute to discuss
taking technology to Cameroon.

59. The Plaintiff refused to travel to Canada to meet with Medic Alert Canada and
SAR-1 with Jamie Sterling due to lack of payment, reimbursement and the like.
In July 2016 a small cash payment was made to entice her to travel to Canada.
As well as he agreed to cover costs for Cynthia McDaniels of Elderwise.

60. July 1, 2016 the Plaintiff responded to viewing documents that Ubimodo Inc
should not be sending out investment offerings claiming partnerships (such as
with Microsoft Corporation and others) when such arrangements did not exist.

61. July 7, 2016 a meeting was held with Wendy Pyle from Hub International and Jim
    Sheppard of Sheppard Insurance to follow-on months of discussion between the
    Plaintiff and Ubimodo Inc to obtain intellectual property insurance to protect both
    Ubimodo and the Plaintiff as a third-party.

    a. The Plaintiff requested an intellectual property insurance policy be
       purchased by the Defendant Ubimodo. As it was becoming apparent that
       Scott Warner was attempting to broker her intellectual property without
       authorization.

    b. There was a conflict of interest between Ubimodo Inc and the Soteria
       Institute sharing actors, staff and leaders. As well as using the non-profit
       status for the benefit of Ubimodo, Inc.

    c. Scott Warner appeared to be using funds raised for the license negotiation
       to support opening yet another business to sell insurance.

62. First week of July, the Plaintiff demanded reimbursement. July 8, 2016 the
    Plaintiff responded to a voicemail that she did not include any hours that fell
    under the Advisory Agreement.

63. July 9, 2016 the Plaintiff Scott Warner handed the Plaintiff an internal Microsoft
    email as evidence that he *did have* a partnership with Microsoft Corporation for
    development of wearables and why he wanted to sub-license the Plaintiff's
    intellectual property to them. (Later disproved by the contact on the very same
    email.) The Defendant Scott Warner would not release the email from his grasp.
    When it was ultimately provided in an email to the Plaintiff in a PDF, the email
    had been redacted to remove contact information.

64. Scott Warner claimed to have "deep ties" and relationships with the Canadian
Provincial Police in Canada through Jamie Sterling and "deep ties" and a
relationship with Deschutes County Sheriff and Search and Rescue. This is
evidenced by Lt. Scott Shelton of Ubimodo Inc, retired from Deschutes County
Sheriff Search and Rescue, brought the Plaintiff a flack jacket for retro-fitting of
the Plaintiff's technology with her UAV protocol at Defendant Scott Warner's
suggestion. Parties advised that would be contract work only, for which Ubimodo
was unwilling to provide a product specification. The Plaintiff informed them she
was unwilling to translate her work for free.

  a. Scott Warner CEO and Chairman of the Board of Ubimodo Inc knowingly
  and without consent or authorization shared trade secret information with
  members of the Canadian Provincial Police and SAR-1 with the intent to
  duplicate, or give knowledge of the Plaintiffs trade secrets related to a
  product. With the intent to sell, trade or license converted product in
  interstate or foreign commerce. With the knowledge that such conversion
  would injure the Plaintiff.

65. Scott Warner directed the Plaintiff to a website in which to download a Microsoft
Program so she could access the "share" folder of Microsoft One Note. She was
provided with an email from the Soteria Institute to use the account.

66. July 10, 2016 the Plaintiff made in known in writing she wanted to attend the on-
campus meeting at Microsoft with Mark Davis of Code Chops. (Reference #63.)

67. July 14, 2016 the Plaintiff responded in an email to Ubimodo's request regarding
a divisional patent application. The Plaintiff additionally advised Scott Warner

CEO and Chairman of the Board of Ubimodo against making false written claims
that his platform was patented when it was not. The Plaintiff stated in an email
that she was unable to determine if Ubimodo could pass the "Freeman-Walter-
Abele test to determine whether a computer program is patentable subject matter
pursuant to 35 USC 101."

68. July 2016 Scott Warner increased his demands for trade secrets and demanded
information he was not yet entitled.

69. July 2016 Scott Warner was given knowledge and notice that purported point of
contact, Steve Fox head of Azure Analytics at Microsoft Corporation denied in
writing a partnership with Ubimodo Inc. He wanted to know how the Plaintiff had
seen an internal email. (Reference #63.)

70. July 14, 2016 Scott Warner CEO and Chairman of the Board denied having
received invoices for payments as the reason he "had not cut the check."

71. July 26, 2016 the Plaintiff emailed Scott Warner of Ubimodo Inc and Sam Al
Muranni of Babylon Bio-consulting of the need to clear up Third-Party shop rights
and the need to protect the Plaintiff's intellectual property. Further, the Plaintiff
requested to clarify if Ubimodo was using open source code, api or programs that
they wanted to blanket with the Plaintiff's intellectual property rights due to
concerns for false marking. It was becoming obvious that Ubimodo was
unlawfully claiming the use of the Plaintiff's letters patent for investment,
partnership and other business uses without authorization. As well as handing
out business documents assuming that the Plaintiff's intellectual property could
blanket the use of third-party content that was not entitled to patent or copyright

protections afforded by a license agreement of the Plaintiff's intellectual property. And there was growing concerns that he was using third-party content.

72. 7-27-2016 Scott Warner was angry that the Plaintiff would not disclose trade secrets. Loosing his normal decorum and halo effect, he remotely accessed her computer. Scott Warner, CEO and Chairman of the Board of Ubimodo Inc and Ubimodo Insurance LLC accomplished this when he failed to disclose to the Plaintiff that the One Note access link was actually an enterprise version of Office 365 under The Soteria Institute. (Instead of installing an application to open the program.) This gave Ubimodo and The Soteria Institute actors remote access and control of her personal computer. This violated the Plaintiff's reasonable expectation that her personal computer would be private.

  a. Despite being told the download would allow her to access the One Note Notebook, the Plaintiff could not access the files.

  b. Scott Warner CEO and Chairman of the Board of Ubimodo locked the Plaintiff out of her personal computer when she refused to give him trade secrets.  Scott Warner demanded trade secret information in order to unlock the computer.  The Plaintiff demanded her Microsoft Surface to be unlocked and the Defendant Scott Warner finally acquiesced, stating the Plaintiff would lose all of her files if the Defendant Scott Warner "pushed a disconnect button".  The Defendant denied backing up the Plaintiff's system to his computers.

73. On 8-1-2017 the Plaintiff notified Scott Warner CEO and Chairman of the Board of Ubimodo that her emails were not being received and had been told that were forwarded to a UK server by her tech support.

    a. Go Daddy fixed the email forward and reverted it back to the Plaintiff's control.

    b. The Plaintiff was still unable to access the One Note Notebook and she bypassed Scott Warner CEO and Chairman of the Board of Ubimodo and went directly to Norman Furlong. Mr. Furlong provided the Plaintiff with a working access link. Upon accessing the One Note share file, the Plaintiff discovered that Scott Warner CEO and Chairman of the Board of Ubimodo had been intercepting oral communications without her consent, recording them and uploading them into the Microsoft One Note on-line share account. Scott Warner had known team members in the United States in Oregon, Washington, California, and Virginia. As well as members in Canada and Bermuda. He was additionally known to conduct business in Cameroon and Israel.

74. On 8-2-2016 the Plaintiff provided a copy of the updated license agreement to Ubimodo Inc to reflect the issued patent and again requested Ubimodo provide "Affidavits from your group for indemnifications from any 1) current employment or recent (within 2 years) hired to invent positions 2) pre-invention disclosures, 3) shop rights, or 4) if anyone is subject to inevitable disclosure doctrine as an employee or independent contractor."

75. On 8-10-2016 Ubimodo Inc and The Soteria Institute finally responded with the fiscal sponsorship paperwork in an attempt to garner trade secrets under the disclosure and management requirement of research oversight during fiscal sponsorship of a pre-approved research grant.

76. On 8-11-2016 Ubimodo Inc via email made it understood that the fiscal sponsorship documents provided by The Soteria Institute was an effort to barter for the Plaintiff's trade secrets that Ubimodo Inc wanted. The emails did not include an executed agreement from The Soteria Institute.

77. On 8-15-2016 legal counsel for Ubimodo Inc requested trade secrets and unpublished intellectual property from the Plaintiff's counsel at Stinson Leonard and Street, Andrea Sellers. Mrs. Sellers had already passed the license negotiation onto Husch Blackwell and Joan Archer due to the conflict Ubimodo created with other clients at Stinson Leonard and Street.

78. 8-16-2016 Jason Conger at Lynch Conger McLane and Chandra Edit at Miller Nash Graham and Dunn LLP, and Ubimodo Inc refused to clear up third-party rights, remove unlawful recordings of the Plaintiff from their share file, refused to bring invoices up to date, and refused to clarify what exact business Ubimodo Inc was in or why the Plaintiff's intellectual property was being used in relation to garnering funding to open an insurance business.

   a. Ubimodo's counsel was given permission by the Plaintiff's counsel to speak directly to the Plaintiff to clear the due diligence concerns. (To reduce cost for Ubimodo Inc.)

79. 8-19-2016 Ubimodo Inc and Scott Warner were sent invoices again for unpaid bills.

80. 8-23-2016 The Soteria Institute and Michael Corning were emailed regarding fiscal sponsorship contract that had been pending for months. In lieu, he was given the option to pay for the program development/web content requested by Scott Warner acting as bookkeeper for The Soteria Institute. (There was an agreement to reduce the administrative oversight percentage in exchange for program development. In essence, a delayed payment for service agreement.)

81. 8-29-2016 Ubimodo Inc terminated the memorandum of understanding as his demands were not being met.

82. In or around the beginning of October 2016, the Plaintiff's computer was remotely crashed and the hard-drive erased. It was determined to be a result of a "disconnect" from The Soteria Institute enterprise edition software installed on the Plaintiff's computer.

   a. The Plaintiff believed her computer to have been cleared of The Soteria Institute Microsoft Enterprise account in August 2016. While the desktop log-in was changed back to her personal account, the software still believed the computer to belong to The Soteria Institute. Which allowed a hard drive wipe/crash in or around October 6, 2017.

   b. The Plaintiff believes this was an attempt to prevent her from learning of continued mis-use and misappropriation of her trade secrets.

83. 10-16-2016 the Plaintiff received an email (not forwarded into Microsoft Outlook due to the system crash) from Jamie Sterling of Toronto Canada with an update

about a meeting with himself, Bob Koester and Medic Alert Canada which
included a discussion about the Plaintiff's intellectual property.

   a. The Plaintiff called Jamie Sterling to give notice of non-grant of right. He
      stated he had not been notified by Scott Warner that the license was not
      issued on the Plaintiff's intellectual property.

   b. The Plaintiff called Bob Koester to give notice of non-grant of right. He
      stated he had not been notified by Scott Warner that the license was not
      issued on the Plaintiff's intellectual property. Bob Koester further stated
      he had no written memorandum of understanding with Scott Warner. He
      had been given shares "for free". He went on to confirm that the
      Department of Homeland Security did not give up march-in rights nor had
      he given Ubimodo Inc an exclusive license as relayed to the Plaintiff and
      others.

   c. The Plaintiff called Medic Alert Canada to give notice of non-grant of right
      to Ryaz Moledina. He offered to maintain transparency with the Plaintiff.
      As he inquired if the Plaintiff had a problem if Medic Alert Canada
      maintained relations with Ubimodo and Jamie Sterling. Plaintiff wished
      them well and requested they steer clear of her intellectual property. Mr.
      Moledina was given notice of the copyright registration (Berne
      Convention) and that the Plaintiff was patent pending in Canada.

   d. As of the end of 2017 it is unclear if Medic Alert Canada is still negotiating
      with Ubimodo for use of the Plaintiff's intellectual property and trade
      secrets.

84. In late August/September 2017, the Plaintiff was congratulated via a telephone
call for receiving a 1.5-Million-dollar convertible note from Armour Holdings of
Bermuda reported as distributed through its subsidiary Bevidere to fund the
license agreement with Ubimodo Inc. The caller was notified that the license was
never granted.

85. In or around September 2017, the Plaintiff spoke with Marcus Dorian COO of
Armour Risk Management Inc. She congratulated Mr. Dorian on his recent
investment and apologized for needing to ask if her intellectual property played a
role in their decision to invest. Mr. Dorian ask the Plaintiff how she knew about
the investment as there was only "two people" in his company that even knew it
occurred. He stated he would open an internal investigation. Marcus Dorian
failed to respond to the outcome of his investigation.

86. On January 22, 2018 Ubimodo Inc responded with a libelous statement and
threat through new counsel Bill Buchanan. "Most recently you made inflammatory
and untrue assertions to executives of Armour Group Holdings Ltd, investors in
Ubimodo Inc., and encouraged Armour to stop doing business with Ubimodo.
The above actions are fraudulent and wrongful. As such, Ubimodo plans to
pursue its legal remedies against you unless you immediately cease and desist
your unlawful actions. To that end, we demand that you discontinue all
communications about Ubimodo and its business to all Ubimodo customers,
vendors, investors, employees, and other business associates."

   a. The Plaintiff gave Marcus Dorian well wishes and said something to the
   effect; "I apologize for raising concern. If this is kosher - I wish you all the

best and hope you are wildly successful - to the point you can retire on some warm beach bouncing grandbabies on your knee."

b. Based on facts and circumstances the Plaintiff believes Armour Group Holdings LTD was dissolved at the time of the January 22, 2018 letter. A January 3, 2018 press release stated that Armour had raised $500M in equity investments: "As part of the transaction, the former Armour holding company will rename itself Trebuchet Holdings and transfer the Armour brand name to the new group. Trebuchet Holdings will also contribute its existing P&C run-off platform to the newly established holding company." And, "Investment proceeds will be used to fund the formation of a new reinsurance group, Armour Group Ltd., that will co-invest in global P&C run-off transactions in parallel with the group's affiliates."

87. Armour Risk Management Inc, as of the time of this filing, have refused to confirm or deny the use of the Plaintiff's intellectual property in their investment and fundraising process with Ubimodo Inc, Ubimodo Insurance LLC or Ubimodo LTD.

88. Based on facts and circumstances, it is difficult for the Plaintiff to ascertain who all the Defendant Scott Warner shopped the Plaintiff's intellectual property and trade secrets in his attempts to garner investment or find a receptive market.

89. Based on facts and circumstances, the Plaintiff believes the inappropriate use of her intellectual property has caused irreparable damage.

90. Based on facts and circumstances, the Plaintiff holds a reasonable belief that Scott Warner CEO and Chairman of the Board of Ubimodo and The Soteria

Institute began conspiring to use her public intellectual property for personal gain in or around August 2015 with their team, actors, and agents in the United States and abroad when they had no rights.

91. Based on facts and circumstances, the Plaintiff holds a reasonable belief that parties within The Soteria Institute and Ubimodo Inc conspired to elicit trade secrets beginning in fall 2015.

92. Based on facts and circumstances, the Plaintiff holds a reasonable belief that Scott Warner and Ubimodo Inc used the Plaintiffs intellectual property as a surety to gain business affiliations, investment and relationships in Israel, Bermuda, and Canada.

93. Based on facts and circumstances, the Plaintiff believes that the Defendants conspired to misappropriate electronic and non-electronically stored proprietary trade secrets, and one or more of the parties shared the information with third parties capable of reducing the information to practice.

94. Based on facts and circumstances, the Plaintiff believes the defendants reduced at a minimum, her copyright to practice as part of their Smart Safety App being sold with their insurance policies of Starr Companies.

95. Based on facts and circumstances, the Plaintiff believes that Scott Warner CEO and Chairman of the Board of Ubimodo Inc intentionally withheld payment with the sole intent to cause a loss of international patent protection for the Plaintiff. Due to intentional non-payment, the Plaintiff suffered a valuable loss of European Union patent protection.

96. Based on facts and circumstances, the Plaintiff holds a reasonable belief that the Defendant is withholding payment in an attempt to cause a further loss of her Canadian and Australian patent protections.

97. Based on facts and circumstances, the Plaintiff holds a reasonable belief that the Defendant has made use of her Code-API-Software-Database copyright and has reduce it to practice. As the Defendant is selling Starr Company Insurance Policies with an automatic membership (per his website) to the Ubimodo Smart Safety App.

98. Based on facts and circumstances, foreign and domestic entities have been given possession of the Plaintiff's intellectual property and trade secrets with the intent to convert the information for economic benefit.

99. Based on facts and circumstances, the Plaintiff has a reasonable belief that Scott Warner Ubimodo Inc and The Soteria Institute has induced third-party infringement of her intellectual property, including copyright.  Third-Parties include Starr Companies and Armour Risk Management, their actors, subsidiaries and foreign affiliates.

## SECOND CLAIM FOR RELIEF

[Fraud, Employment of manipulative and deceptive devices, Wire Fraud, Free Speech]

1. In August 2015, the Defendant Scott Warner made contact with the Plaintiff via email to inquire if she would consider being a guest speaker for a roundtable discussion at a Citizen Safety Architecture (CSA) 2020 Conference that never materialized.  He invited the Plaintiff to an interview and used elicitation techniques to ask the Plaintiff "practice questions" regarding wearable technology

and "where you can take it." Questions were directed to how the Plaintiff could translate her underlying technology to different market segments.

   a. The Plaintiff would learn in July 2016 that CSA was invented by Microsoft Corporation and released in 2009 and Microsoft had not partnered with Ubimodo to update nor modify the CSA program.

2. On 11-4-2015 Gary Liberson emailed the Plaintiff claiming to be a biostatistician interested in discussing the Plaintiff's company. The Plaintiff met with him on or around December 8, 2016 at E::Space Labs LLC. He was not interested in the equine clinical trial that had just completed in the United Kingdom as anticipated. He attempted to ascertain non-public information regarding the Plaintiff's capability and status of human product translation. It would later be discovered that the meeting had been arranged by Scott Warner CEO and Chairman of the Board of Ubimodo Inc in an attempt to learn of human translation capabilities and trade secrets.

3. The Defendant used manipulative and deceptive devices with the intent to commit fraud as early as Fall 2015 in order to obtain investment from unsavvy investors as well as accredited investors, and used email and the internet in the furtherance of his scheme in the USA and abroad. Further, it is believed that he disclosed information to Atlantic Securities LTD (Dean Carberry) regarding the Plaintiff and her intellectual property.

4. Beginning in December 2015, Scott Warner, Ubimodo Inc and The Soteria Institute used a manipulative and deceptive practice to elicit non-public information and trade secrets by offering a pre-approved research grant with no

intention of actually providing fiscal sponsorship. Throughout 2016 Scott Warner used the fiscal sponsorship offer as a means to extort information.

5. In February 2016, the Defendant Scott Warner and Ubimodo gifted the Plaintiff shares in Ubimodo Inc. The Plaintiff was shown documentation that shares were given to people in California, Virginia, Oregon and Washington State. The Defendant Scott Warner failed to provide share certificates, shareholder agreements or documentation for offering shares interstate.

Upon information and belief, the Defendant Scott Warner offered shares internationally without the issuances of shares or notice valuation or notice of shareholder rights and without providing valuation documentation.

6. February 26, 2016 and March 1, 2016 Scott Warner arranged an e-introduction to Dean Carberry of Atlantic Securities LTD. The Plaintiff now believes this was a pretense set-up by Scott Warner CEO and Chairman of the Board of Ubimodo Inc to obtain her business information, product development financial information and the like to assist Ubimodo in fundraising and to give the impression that her intellectual property could be used as a surety to fund Ubimodo Inc. Dean Carberry was reported as instrumental in assisting Ubimodo with funding and affiliations with CV Starr, Bevidere and Armour Group Holdings.

7. April 2016 Scott Warner and Ubimodo Inc provided cap table and financials to Axiom Capital of New York, NY that demonstrated he gave shares to the Plaintiff in April 2016.

   b. It is believed these same documents were used with Merit Harbor Group in Seattle Washington; Babylon BioConsulting of Cheyanne,

Wyoming; Atlantic Security Limited of Bermuda; Armour Holdings of

Bermuda and its United States office in Pennsylvania; Starr

Companies in Georgia. The financials submitted to Axiom Capital

showed memberships that were to be coming on board for that

benefited from the Plaintiff's copyright which showed USAA, SEIU,

Strava, and others as dues paying members.  Many of the companies

listed denied verbally or in writing having knowledge of Scott Warner or

Ubimodo Inc during due diligence for the license royalty agreement.

8.  In July 2016 Scott Warner tricked the Plaintiff into downloading a "share-point"

program.  However, the website the Plaintiff was directed to was later learned to

be an enterprise program giving a backdoor access to Ubimodo of her personal

system.

9.  In and around July 2016, the Plaintiff was shown differing cap tables, investment

offerings, and a wide range of valuations for use of her intellectual property from

the hundreds of millions to billions of dollars.  Scott Warner showed the Plaintiff

multiple documents/power point slides that used logo's from Deschutes County

Sherriff Office (DA Hunnel is unaware of any agreements with Ubimodo Inc),

Ontario Canada Provincial Police, bdS Productions, the Department of Homeland

Security, Microsoft, Xerox, and other companies to give the impression he had

partnerships, funding or endorsements and to justify his demand to sublicense

the Plaintiffs intellectual property and use of her trade secrets.

10. In July 2016 it was discovered that Scott Warner and Ubimodo Inc was

intentionally having the Plaintiff arrive late to conference calls or meetings.  The

Plaintiff would be asked to give a brief biographical summary. Then the Defendant Scott Warner would bring up the Plaintiff's intellectual property portfolio, awards and nominations. This is believed to add validity to his fraudulent claims that he was co-developing the Plaintiff's intellectual property or that he had a grant of rights that did not exist.

11. The Defendant Scott Warner and Ubimodo Inc used manipulative and deceptive trade practices during in-person meetings with the intent to defraud unsophisticated investors or potential business partners, including deceiving the Plaintiff. Further, the Plaintiff was reprimanded by the Defendant Scott Warner for asking in an investment meeting- where checks were written – why she and her intellectual property was used to raise funds to open an insurance agency.

12. The Defendant Scott Warner and Ubimodo produced different cap tables and financials. Scott Warner showed paper copies of financial documents that ranged from several million to upwards of thirteen billion dollars by year five of launch. These claims were made to the Plaintiff and others.

13. Scott Warner made attempts to artificially inflate the value of his shares by claiming the funding from the Department of Homeland Security to dbs Productions and Bob Keoster was somehow under the umbrella of Ubimodo, Inc. However, he could not produce an MoU with Bob Koester to prove the "exclusive use" nor demonstrate revenue streams from the sale of data from the database.

14. In July 2016 the Plaintiff refused to make false statement at an international conference in Toronto Canada. The Defendant Scott Warner decided to put retired officer Lt. Scott Shelton on stage with the Plaintiff. Scott Shelton made

false or misleading statements from the speech written for him by Scott Warner CEO and Chairman of the Board of Ubimodo Inc for the investment competition, at Medic Alert Canada and other business presentations.

15. August 1, 2016 the Plaintiff discovered that the Defendant Scott Warner had been intercepting communication and uploading the recordings to the cloud in a One Note to be shared with his team in multiple states and abroad.  (Parties of whom had no confidentiality agreement in place with the Plaintiff, nor with Ubimodo.) The Plaintiff was not consented in writing nor verbally to record her conversations. The Defendant stated he would remove all of the recordings. He did not take them all down.

16. The Plaintiff Scott Warner and Ubimodo Inc breached contracts to the Plaintiff, Husch Blackwell and Stinson Leonard and Street for services rendered throughout 2016 and he ignored or disrupted all collections attempts in 2016 and 2017.

17. In September 2017, the Plaintiff personally requested payment from Scott Warner at Ubimodo offices.  He refused to make payment and implied that the Plaintiff lost her digital records to prove debts.

18. In October 2017, he and his counsel Jason Conger conspired stop a valid collection attempt from Credit Associates 1 (Wes Fisher).  Jason Conger raised the specter of fraud by claiming his client had already paid bills that are still unpaid.

19. An ethics complaint was filed against Ubimodo's business Advisor and General Counsel Jason Conger at the Oregon State Bar on 12/6/2017.  Jason Conger

responded on January 9, 2018 – which included the fraudulent advisory agreement. (Reference #36b) On 1/22/2018 Ubimodo Inc hired additional counsel, Bill Buchanan of Schmid Malone Buchanan LLC to send a Notice of Exclusion/Cease and Desist Demand to the Plaintiff. Upon information and belief that was to retaliate for the State Bar complaint, threaten, intimidate and denigrate the Plaintiff. (Reference #86.)

20. The demand to cease communications is an affirmative act to inhibit the Plaintiff's speech with parties related to Ubimodo to 1) prevent her from learning of the Special Shareholders meeting, and 2) to inhibit her ability to ascertain wrongs and defend her intellectual property rights. Based on facts and circumstances, the Plaintiff believes this violates her rights under the Oregon Constitution for victims' rights, and the right for free expression of speech. (Reference #86.)

21. February 1, 2018 Bill Buchanan was given written knowledge and notice that the Plaintiff had a dispute with his client Scott Warner and Ubimodo for misappropriation and suspected economic espionage by his client.

22. The Plaintiff received notice that Ubimodo Inc was planning on a special shareholders meeting on February 12, 2018 for a reverse stock split. A Notice to delay was sent to Mr. Buchanan until such time it could be determined what impact the Plaintiff and Defendant dispute would have on shares. Mr. Buchanan indicated he could not pass the notice on, despite writing he was hired to resolve the dispute between parities, and then ceased any further attempts to resolve the dispute between the Plaintiff and the Defendant Scott Warner.

23. Jason Conger, Ubimodo counsel and business advisor failed to respond to the
    Notice to Delay sent to him (subsequent to Bill Buchanan) to give time to
    ascertain the impact to the Plaintiff's dispute. (The Plaintiff has knowledge of
    multiple disputes with other parties who are owed shares, reimbursement or pay
    by Ubimodo Inc.)

24. Scott Warner and Jason Conger refused to provide a valuation to the
    shareholders that they *did* recognize for the special shareholder meeting. After
    the vote, Lynch Conger McClane responded to the minority shareholders that
    they were no longer entitled to know such information.

25. On February 12, 2018, Scott Warner CEO and Chairman of the Board for
    Ubimodo Inc and the majority shareholder Jan McDonald (the life partner of Scott
    Warner) voted for a 900,000 to 1 reverse stock split to squeeze out all minority
    shareholders. The only shareholder with 900,000 shares was Scott Warner CEO
    and Chairman of the Board of Ubimodo's life partner. A spoilt cap table was
    used where Ubimodo Inc and Lynch Conger McClane failed to recognize all
    stockholders  - while admitting that no one had been issued certificates. Further,
    there is no indication that minority shareholders were made aware of the dispute
    with the Plaintiff by Ubimodo Inc or its counsel. Despite financials demonstrating
    1.8 Million in payable notes and real assets at around $25,000 dollars, Scott
    Warner CEO and Chairman of the Board of Ubimodo Inc determined that 9 cents
    a share was a fair price on 4 million shares. Further, the company failed to
    disclose what surety was offered in place of the Plaintiff's intellectual property
    when Scott Warner failed to make notice of non-grant of right to many parties.

26. Upon information and belief, Scott Warner used his undue influence as the CEO, Chairman of the Board, and as the life partner to the majority stock holder to force a reverse stock split.

27. Upon information and belief, Scott Warner and his counsel Jason Conger conspired to withhold material information from other shareholders regarding the reverse stock split. Including knowledge of share and compensation disputes with the Plaintiff and other parties, and failed to notify convertible note holders of the vote and its impact on the conversion.

28. Scott Warner failed to provide shares and/or compensation to many parties including the Plaintiff. Additionally, the cap table used for the reverse stock buy-back was contradictory to the cap table used to conduct business for funding requests, or to secure services and work on delayed compensation. Scott Warner refused to acknowledge parties he promised stock during the special shareholders meeting and effectively squeezed out all minority share holders.

29. Minority shareholder and previous business partner Steve Minar stated that the original Ubimodo LLC was dissolved because he caught Scott Warner misusing investment funds for personal use on at least three occasions that caused an interruption to business due to the toll on cash flow.

30. The Plaintiff has reason to belief the Defendant Scott Warner was misusing investment funds she assisted the Defendant to obtain in the furtherance of the license negotiation.

31. Starr Companies and Armour Risk Management and Atlantic Securities LTD of Bermuda were aware of the Plaintiff's intellectual property. Armour Risk

Management was given knowledge and notice that a grant of right was not given in September 2017 and this information should have been transmitted to all parties tied to the investment and business dealings of Ubimodo Inc, Ubimodo Ins, and Ubimodo LTD.  Marcus Dorian stated he would open an internal investigation as to whether or not the Plaintiff's Intellectual Property was a consideration in the investment made into Ubimodo, Inc.  Armour Risk Management refused to respond to the outcome of the investigation in January 2018. The Defendant Scott Warner had Bill Buchannan threaten lawsuit against the Plaintiff on 2-9-2018 and made false statement about the intellectual property inquiry.

32. Upon information and belief, Scott Warner, Ubimodo and The Soteria Institute misappropriate trade secrets for the economic benefit of himself and others in the United States and abroad knowing that this would bring harm to the Plaintiff.

33. Upon information and belief, Scott Warner used false pretense to acquire knowledge, goods, services, videos, images, data, plans, engineering specifications, financials, business records and the like with the use of fictitious documents and ingenuine offers of shares and future payments with the intent to defraud. He shared these documents to the cloud for his collaborators at Ubimodo and The Soteria Institute to access.  In the furtherance of his financial schemes, he sent misleading business instruments as email attachments in the furtherance of his schemes to parties in multiple states and countries.

34. Upon information and belief, the Defendant Scott Warner prayed on the Plaintiff
    as, due to disability, she is of modest means to seek legal recourse for his
    wrongful, if not criminal, actions.

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to
order. Do not make legal arguments. Include any basis for claiming that the wrongs
alleged are continuing at the present time. Include the amounts of any actual damages
claimed for the acts alleged and the basis for these amounts. Include any punitive or
exemplary damages claimed, the amounts, and the reasons you claim you are entitled to
actual or punitive money damages.

1. The Plaintiff institutes this action for actual damages, statutory damages,
   attorney's fees, and the costs of this action against defendant(s).

2. The Plaintiff respectfully requests the Defendants be required to obtain a
   surety bond due to the likelihood of the success of this case on its merits.
   The Plaintiff respectfully requests a court bond (such as a statutory bond
   or open penalty bond) at not less than penal sum.

3. As a direct and foreseeable result of flagrant misstatement or omission of
   material fact in connection with the actual sale of its securities to venture
   capital firms and unsophisticated investors Scott Warner CEO and
   Chairman of the Board of Ubimodo Inc had financially benefited from
   misappropriation of the Plaintiffs' intellectual property, trade secrets,
   goodwill, and services. A forensic accounting of all investment and profits
   from Ubimodo Inc, Ubimodo Insurance, and Ubimodo LTD, its investors
   and partners is needed to determine damages.

4. Despite the Plaintiff's courteous and good faith attempts to clear concerns, the Defendants and their actor's behavior rose to alarming concern where she reported actions and behaviors to law and regulatory enforcement.

5. As a result of the use of her free speech to courteously resolved concerns, ask questions, reach a conciliation and report alarming behaviors, Ubimodo retaliated with demands to halt her free speech, libeled her and denigrated her character and placed her under threat of lawsuit.

6. The Plaintiff suffered moral outrage, defamation of her person and extreme distress as a direct result of the Defendants actions causing non-economic damages.

7. As a direct and foreseeable result of multiple and repeated unlawful behavior by Scott Warner and the Defendants, they are jointly and severably liable for harms.

8. The Plaintiff has suffered a violation of her personal property rights under State and Federal Law and harms per se as a result of the injuries resulting in economic damages yet to be determined.

9. As a direct and foreseeable result of failures in duty of care, uniform trade secrets act, defense of trade secrets act, national stolen property act, Economic Espionage Act, the Defendants have had economic gain that is expected to continue domestically and in foreign nations.

10. As a direct and foreseeable result of cybercrimes, wire fraud, and unauthorized access to and destruction of her computer's hard drive memory the Plaintiff has suffered valuable loss. The Plaintiff has been deprived of income, development data, translational data and supporting enablement's of scientific discovery; and opportunities. As well as the solace of pictures and videos of a personal nature contained on the systems lost through intentional access to devices when there was no authorization to do so.

11. As a direct and foreseeable result of failure to pay obligations the Plaintiff was deprived of considerable value, personal property rights and comfort. The Plaintiff believes this was done by Scott Warner intentionally to force patent application abandonment. As well as to preclude the Plaintiff from seeking legal remedy.

WHEREFORE, Plaintiff prays the courts allows her to correct any informality to her complaint or accompanying documents.

WHEREFORE, Plaintiff prays for judgement against Defendants as follows:

1. For non-economic damages in the amount of $500,000;

2. For loss and redress of intentionally destroyed property committed to electronic storage not less than $1,000,000;

3. Outstanding debt owed to Plaintiff and her counsel $60,000 with interest if the court so states;

4. Accounting of damages for compensatory and consequential damages from all Ubimodo business and third-parties economically benefiting from infringing copyright not less than $150,000 per incident.
5. Value of reasonable licensee fee or royalty fee for direct or induced infringement of copyright or derivative patent works;
6. Punitive damages for libel and hindering free speech as determined by the court;
7. Forfeiture of assets obtained through fraud or deception; Judicial dissolution of Ubimodo Inc, Ubimodo Insurance and the wholly owned subsidiary Ubimodo LTD of Toronto Canada;
8. For costs and disbursements incurred herein;

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 3 - 9, 2018

Signature of Plaintiff _Kelly A Barnett_

Printed Name of Plaintiff _Kelly A. Barnett_

**B.**     **For Attorneys**

Date of signing: _____, 20____.

Signature of Attorney _____

Printed Name of Attorney _____

Bar Number _____

Name of Law Firm _____

Address _____

Telephone Number _____

E-mail Address _____